[No. 2101.]

## T. D. White v. The State.

1. **Murder—Reasonable Doubt—Charge of the Court.**—The true rule upon the doctrine of reasonable doubt as applied to murder of the second degree is that the inculpatory proof must show beyond a reasonable doubt the *absence* of the mitigating, excusing or justifying facts.

2. SAME—SELF DEFENSE.—It is a part of the law of self defense under the
code of this State that an assailed party is not bound to retreat in order
to make good his right of self defense. Failure to so charge the jury
will not of itself necessitate reversal, in the absence of exception, unless,
under all the facts of the case, the omission to so charge was calculated
to injure the rights of the accused. The omission in this case, not hav-
ing been excepted to, and being in no wise calculated to prejudice the
accused, was not reversible error.

3. SAME.—An established rule upon the right of self defense, when the
slayer provoked the occasion for the killing, is as follows: "If he (the
slayer) provoke the contest, or produce the occasion, in order to have a
pretext for killing his adversary, or doing him great bodily harm, the
killing will be murder, no matter to what extremity he may have been
reduced in the combat. But if he provoked the combat or produced the
occasion, without any felonious intent—intending, for instance, an ordi-
nary battery merely—the final killing in self defense will be man-
slaughter only." See the opinion *in extenso* for a charge upon the sub-
ject *held*, in view of the evidence, erroneous.

4. SAME.—It is an equally well established rule that "no words nor libelous
publications, however aggravating, will compromit a slayer's right of
defense, if in consequence of the same he is attacked; for no words, of
whatsoever nature, will justify an assault." *Held* that, under this rule,
and in view of the evidence, the trial court erred in refusing the defend-
ant's requested instruction to the effect that threats made by defendant
against deceased did not operate to deprive defendant of his right of
self defense.

APPEAL from the District Court of Victoria. Tried below before
the Hon. H. C. Pleasants.

The conviction in this case was in the second degree for the
murder of Dolph Mathena, in Jackson county, Texas, on the
eighteenth day of November, 1884. The change of venue to Vic-
toria county, in which county the trial was had, was awarded
upon the application of the appellant. The penalty assessed by
the verdict was a term of five years in the penitentiary.

George Washington was the first witness for the State. He
testified in substance that on the day of the homicide he was
engaged at a work-bench, in the town of Edna, Jackson county,
Texas, about fifty yards east of an oyster saloon occupied by the
deceased. While thus engaged, the witness heard a noise like
the falling of a box, but did not look up from his work at that
time. Shortly afterwards he saw Dan Franklin and Taylor
White (not the defendant) running from the north end of the
saloon. As they passed the witness one of them remarked: "I
believe he has killed that fellow!" Looking then towards the

saloon witness saw defendant and deceased in the saloon. Defendant was standing near and in front of the counter, with a pistol in his hand. Deceased was walking from behind the counter around the end next to the east wall. Defendant had deceased covered with the pistol, and deceased was backing towards the front door, holding both hands up in front of him. He had nothing in either hand. Deceased fell in the door, and defendant put his pistol in his right hand overcoat pocket, and stepped to the gallery, whence he went up to the street. Deceased on that morning borrowed a hammer and got some nails from witness, with which to nail up a curtain.

Cross examined, the witness testified that no shot was fired after he caught sight of the defendant and the deceased. The witness was working at a point east of the Mathena oyster saloon. The saloon had three windows on that side, but no opening in the west wall. The east windows were down at the time the witness saw the occurrences described. The front window of the saloon was about three feet distant from the front door of the saloon. The witness did not go towards the saloon after he witnessed the fall of the deceased, because he was restrained by his employer. A man named Albert and one Krahlmeyer were working at the bench with the witness at the time deceased fell. All that the witness saw he saw through the front window. The witness was here shown a photograph which he said represented the parties in the positions occupied by himself, Albert, Krahlmeyer and Cooper at the time the killing occurred. Witness was at the work bench when he saw deceased with both hands raised. Cooper was nearer the oyster saloon than witness was. Witness was on that side of the work bench farthest from the saloon, and Krahlmeyer and Albert on the side nearest the saloon.

Ambrose Crockett testified, for the State, that he was on the gallery of the opera house in the town of Edna at the time of the homicide. Deceased approached the defendant, who was then standing near the witness, and told him that he wanted him, defendant, to pay for the damage done to the oyster saloon on the previous night. Defendant asked deceased the amount of the damage he claimed. Deceased replied, naming the sum of five dollars. Defendant replied that he would kill deceased before he would pay him five dollars. Deceased then said that he would sue the defendant. Defendant replied: "If you sue me I will kill you," and walked off towards Owens's drug store.

This occurred about nine o'clock in the morning. The witness was in the employ of the deceased prior to the homicide, and often used a hatchet in killing poultry, which, when used, he, for a time, threw into the deceased's back room. Deceased finally directed him to place the hatchet under the edge of his counter to steady some broken part of the said counter. Witness last placed the hatchet under the counter but a short time before the homicide—not less than one, nor more than a few days. This witness, on cross examination, testified that defendant did not appear angry when he said that he would kill deceased before he would pay him five dollars. On the contrary he was laughing.

Fred Sparks was the next witness for the State. He testified that he was among the first to reach deceased after the shooting, and found him lying on his back, in his door, his head and shoulders extending out of the door. Death ensued in a very few minutes after deceased was placed on the gallery, when witness went into the oyster saloon with those with him—Messrs. Whitney, Hodge and Cooper. When he got inside the witness saw a hammer and a few nails on the counter, but saw no hatchet at that time. The back door, to which no key was found, was then secured by placing a box against it. The front door was then locked, and the key was delivered to the county attorney. About that time Owen came down the street and asked if any one had seen the man who claimed to have seen deceased advancing on defendant with a hatchet. The saloon was then re-entered, and a hatchet was found under the east end of the counter, the blade pointing outwards from the counter. The hatchet was taken up and examined by some one, but was replaced in its exact position where found. The hatchet, when first discovered by the witness, was covered with pecan hulls and dust, and appeared to have occupied its then position, undisturbed, for several days. A curtain divided the saloon from the cook room.

Cross examined, the witness stated that the curtain described was either of calico or domestic cloth. It either rested on or hung a very short distance behind the counter. A table, nine feet long, stood in the saloon, nearer the east than the west wall. The hammer lying on the counter could be easily reached by a man at the table. Witness observed some blood on the floor, between the table and the west wall, about two feet from the counter. It appeared to witness that there was some blood on

the hatchet. Witness was in his bar room, about 150 feet distant from the deceased's oyster saloon, when he heard of the shooting of deceased.

C. Cooper was the next witness for the State. He testified that, when the killing of Mathena occurred, he was engaged at his work bench, about forty-two feet east of the deceased's oyster saloon. He saw Taylor White and Dan Franklin running from the north side of the opera house. Witness looked toward Mathena's saloon and heard something which sounded to him like a death scream. He could not see who were in the room. He could see objects moving about, but could not distinguish them as men. It was then between ten and eleven o'clock, and the morning sun, shining against the window panes of the saloon, rendered it difficult for one, especially if excited, to see into the room through the window. The windows on each side of the oyster saloon were down. Witness's employes, George Washington, Henry Krahlmeyer and Albert Ernst, started toward the saloon, but were called back by the witness. Witness then went to the place of the killing, reaching it simultaneously with Sparks, Hodge and Whitney. He found Mathena, not quite dead, lying on his back in his door, his head and shoulders protruding. He was drawn out and arranged comfortably on the gallery, where he died a few moments later. Witness and those with him then entered the saloon, the interior of which he described as did the witness Sparks. At the inquest the witness saw a hatchet under the edge of the counter, the blade pointing outward. When witness heard what he took to be the death scream, Washington was standing fourteen and a half feet further from the saloon than witness, or fifty-six and a half feet from the saloon. His position was also fifteen feet north of the street which ran in front of the oyster saloon. He could not possibly from that position have seen any one at the counter, through either of the windows. The witness's eyesight was not good at the time of the killing, but he could read the Galveston News, and distinguish a man at the distance of fifty yards.

Landsey Billups testified, for the State, that he was in the town of Edna on the day of the homicide. Going from the drug store, witness looked into Mathena's saloon, and saw the defendant sitting at the table, and Mathena standing behind his counter nailing up a curtain. Witness had passed but a few steps beyond the saloon when he heard the report of a pistol. Witness did not turn back, but mounted his horse and left.

Gus Ritchie testified, for the State, that he was standing a short distance from the oyster saloon when defendant entered it a short time before the shooting. Witness soon saw Taylor White and Franklin running from some point near the saloon. He soon heard a shot, and, looking towards the saloon, he saw Mathena's head and shoulders hanging out of the door. Defendant presently stepped out of the saloon, over Mathena's body, and walked up the street towards Ward's drug store. Witness then left town.

Noah Hodge testified, for the State, that he was standing on Sparks & Whitney's saloon gallery when the defendant passed up the street after firing the fatal shot. When within thirty feet of witness, defendant remarked: "I killed that d—d nigger because he came at me with a hatchet." Witness heard some one remark that defendant had killed "Ollie." He then went to the saloon and found the person killed to be Dolph Mathena. He soon returned, and found defendant sitting in front of Ward's drug store, and asked him if he was not mistaken in thinking that he had killed Ollie? Defendant answered: "No, I killed Dolph." Witness described the position in which the hammer and hatchet were found, as did the preceding witness.

Taylor White testified, for the State, that he and Dan Franklin were in Mathena's saloon, helping Mathena nail up his curtain, when defendant entered the saloon just before the shooting. Defendant took a seat at the table, and asked twice for oysters, remarking that he was very hungry. Mathena finally told defendant that he had no oysters. Witness and Franklin then went from Mathena's saloon to an adjoining fruit store. They had been in the fruit store but a short time when they heard a noise that sounded like the falling of a box. They ran out and across the street between the saloon and the place where George Washington was at work, sprang into witness's wagon, and drove rapidly out of town. Mathena used a common carpenter's hammer in driving the nails.

William Schorre testified, for the State, that, a few minutes before the shooting, he saw the defendant and deceased talking together on the opera house steps. When ·they separated, deceased went to his place of business, and defendant towards Owens's drug store. Witness saw defendant pass down the street a few minutes later, and soon heard the shot. Defendant presently passed witness on the gallery of Ward's drug store, and remarked, "I have killed the d—n son of a b—h !"

W. H. Coleman testified, for the State, that he was left in charge of Owens's drug store for a time on the morning of the homicide. About nine o'clock the defendant came into that drug store, went behind the counter, and examined several drawers. Witness told him to pass from behind the counter. Defendant replied that he was looking for something he wanted, and that it was all right with the owner. About that time Doctor Wells came in and witness left. About eleven o'clock, being then in the court house, the witness heard the fatal shot fired. Defendant did not say what he wanted, nor could witness say that he got anything while in the drug store.

Deputy Sheriff Chivers testified, for the State, that he arrested defendant at Allen's store a few minutes after the homicide. Defendant said that he killed deceased because deceased was coming at him with a hatchet or a hammer. Defendant, when arrested, had a six-shooter on his person, one chamber of which had been recently discharged.

Ollie Lewis, an employe in the deceased's oyster saloon, testified for the State, in substance, that the defendant was one of a party of three who came to Mathena's oyster saloon on the night before the homicide, and became disorderly. The party got into a row among themselves while eating oysters. They kicked over the table and broke a dish and spoon, when all went out except defendant. After the others had gone, defendant came to the partition between the cook room and saloon and entered into a conversation with witness. He was very drunk, and was protecting his equlibrium by clinging to the curtain. Witness cautioned him against pulling at the curtain, when he said : " D—n the curtain," and jerked it down. Mr. Tatum soon came in, and prevailed on defendant to leave. Deceased was not in the saloon during these proceedings. When he came back and was apprised of what had occurred, he said that he intended to see the parties on the next day, and compel payment of damages or procure indictment against them. The State closed.

Herman Krahlmeyer testified, for the defense, that he was at work near the State's witness Washington at the time the fatal shot was fired. From his position he could and did see into the oyster saloon of the deceased. He saw objects moving around in the saloon, but was unable to identify those objects as men.

The important fact testified to by A. Webb, the next witness

for the defense, was that, on the night preceding the killing, he went into deceased's saloon, and had a conversation with deceased. Deceased said that a party, including defendant, had become disorderly in his house, on that night, and destroyed cer tain property of his; that he did not want defendant to enter his house again, and that if he ever came in again, "cut up," and destroyed his property, he would kill defendant.

Henry Farrington's testimony was to the effect he heard a conversation between defendant and deceased on the morning of, but before the difficulty. · Deceased appeared mad, and some one asked what was the matter? Defendant replied: "He is mad at us for the damage we did, and I propose to pay for it." Deceased asked: "How much; two bits?" Defendant asked: "How much do we owe?" Mathena said: "Five dollars." Defendant remarked during the time that deceased had been after him several times, and that he intended to pay deceased. An hour or two later, witness saw defendant sitting at Mathena's table, and heard him ask several times for oysters. Deceased, who was then nailing up his curtain, finally looked over his shoulder viciously and told defendant that he had no oysters. Witness then left, and soon heard the fatal shot. Witness left the saloon door because he thought from Mathena's manner that there would be a row.

Archibald Smith testified, for the defense, in substance, that he was en route from the depot, in Edna, to the Progress office when the fatal shot was fired. When he reached a point in the road opposite the oyster saloon he heard two men quarreling. He thereupon looked to the saloon and saw a white man and a negro confronting each other, quartering across a table. The negro, whose face was towards the witness, had an uplifted hatchet or hammer in his hand, which he held in a striking position. The white man's left side was towards witness, and witness could see that he had nothing in his left hand. Witness could not see his right hand. The witness could tell from their violent manner that they were quarreling, but could not hear what they said. Witness passed on, and when he had gone a few steps he heard the report of a pistol. Witness afterwards saw the defendant, whom he recognized as the man whom he saw in the dispute with the negro, arrested at Allen's store. When arrested, the defendant said: "I killed the d—d son of a b—h because he was making at me with a hatchet." Witness

11 — TEX. APP. XXIII.

remarked: "That's so, for I saw it." Defendant was then taken to jail, and witness left town.

Joe Denison testified, for the defense, that he had known the deceased from his boyhood until within the last four years. Deceased had always been considered a dangerous man when interfered with, and one likely to execute a threat.

The motion for new trial raised the questions discussed in the opinion.

*J. D. Owens* and *G. A. Staples,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

Hurt, Judge. Appellant was indicted and tried in the court below for the murder of Dolph Mathena; the trial resulting in a conviction for the offense of murder of the second degree. Of the errors assigned—though all have received our patient, careful consideration—but four are thought necessary to be discussed:

1. It is objected to the charge of the court that, in defining the elements of murder of the second degree, the doctrine of reasonable doubt is infringed upon; and, in support of the objection we are cited to the Morgan case (16 Texas Ct. App., 593). Comparison of the two charges develops a radical difference. In the Morgan case the charge was so framed as to require the facts of reduction to be *evident;* whereas, the true rule is that, to convict of murder of the second degree, the proof must show, beyond a reasonable doubt, the *absence* of the reducing, excusing or justifying facts. Considering the definition of murder of the second degree, given in the charge in this case, in connection with the charge, directly applying the law to the facts of the case, there is not the slightest probability that the jury was misled as to the application of the doctrine of reasonable doubt.

2. It is urged that the court should have instructed the jury as to the rights of appellant in a case of "imaginary danger;" that the charge given upon this subject confined the jury to a case of *actual* danger. A charge is correct, or incorrect, as it applies or fails to apply the law to the case made by the evidence. In very many cases, the danger may not in fact be real, and yet appear so to the defendant. When this is so, the rule urged by appellant's counsel becomes of the highest importance, and should be given in charge to the jury. In other cases, the

danger is evident, patent, and in these the rule has no application.

How stand the facts in this case? Without doubt, the danger, if danger there was, was not imaginary, but patent and real to the appellant.

3. The jury were not instructed that the appellant was not bound to retreat, and the omission to so charge is assigned for error. No such charge was requested, nor was the court's omission made the subject of exception. While the court should have given in charge this law, still it does not of necessity follow that the omission will work a reversal of the judgment. If the facts show that the danger was imminent, leaving no opportunity of safe retreat, it is improbable that the jury would hold the defendant to retreat. This is the doctrine laid down in Bell's case. (17 Texas Ct. App., 538.)

4. In giving in charge to the jury the law of self defense, the learned trial judge says: " While it is the inalienable right of every man to protect his person from violence, yet this right does not in every case justify the party assaulted, in defending himself, to the extent of taking the life of his assailant; but one is only justified in taking the life of an assailant when he himself is without fault." This proposition may or may not be correct, and will be discussed further on.

The court carries the same proposition, framed in different language, into its charge on manslaughter, viz: "And if, therefore, the jury should find from the evidence that the defendant went into the saloon of the deceased, and provoked an altercation between himself and the deceased, but without intending to kill the deceased, and deceased assaulted the defendant, or by some act done gave the defendant reasonable apprehension of loss of life, or of great bodily harm, and the defendant killed deceased to protect himself from the apprehended injury, the killing, under these circumstances, would not be justifiable, but (defendant) would be guilty of manslaughter." To condense the proposition the instruction is this: If the defendant was in "fault," or "provoked" an altercation, and then kills to save himself, he will not be justified, but would be guilty of manslaughter. What "fault," or measure of provocation, would deprive one of the right of self defense? The nature and quality of the act (the "fault"—the provocation) the doing of which will deprive one of the right to defend himself, is not given or explained to the jury. Just what acts will abridge one's right of self defense, or deprive

him of it altogether, can never be determined. A very clear and simple rule upon this question will be found in the notes to Staffer's case (Cases on Self Defense, H. & T., p. 227). "If he provoke the contest, or produce the occasion, in order to have a pretext for killing his adversary, or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat. But if he provokes the combat, or produce the occasion, without any felonious intent—intending, for instance, an ordinary battery merely—the final killing in self defense will be manslaughter only."

It will be observed that the *intent* with which the contest, or occasion, was sought, or produced, is of the highest importance. Suppose a defendant provokes a combat, or produces an occasion, without intending to do so; or, let us suppose his acts or language did in fact provoke the contest, but were not intended to have that effect, nor were they such as would usually and naturally lead to a contest. If, under these circumstances, he kill to save himself, or to prevent serious bodily harm, will he thereby be deprived of the full and perfect right of self defense?

In Selfridge's case it was held that "no words nor libelous publications, however aggravating, will compromit his right of defense, if in consequence of the same he is attacked; for no words, of whatsoever nature, will justify assault." (Cases on Self Defense, H. & T., 227. Also vide Cartwright et al. v. The State, 14 Texas Ct. App., 486, for a discussion of this subject.) The rule laid down in the notes to Staffer's case, which we take to be the correct one, clearly indicates that there must be a *purpose* behind the provocation and impelling to it. It is also evident that, notwithstanding the defendant may have provoked the combat or produced the occasion by his own wrongful acts, yet, if these acts were not clearly calculated or intended to have such effect, his right of defense is not thereby compromitted. It is not every wrongful act that will deprive the doer of his right of self defense.

Applying these rules to the court's charge in this case, the charge will be found to contain an erroneous proposition, which, under the facts, may have seriously prejudiced the appellant's rights. Appellant had threatened the life of the deceased, and this was undeniably wrong. He had, with others, on the night before the homicide, in a drunken carousal destroyed the property of deceased; this, too, was a "fault." May not the jury have compromitted his right of self defense because of these

wrongful acts?   Taking this view of the charge of the court (at least with regard to the threats), appellant's counsel asked the court to instruct the jury, in effect, that threats made by defendant against deceased did not operate to deprive defendant of his right of self defense.   The instruction was clearly rendered necessary by the view taken by the court in its charge, and should have been given.   (Parker v. The State, 18 Texas Ct. App., 72.)

Because of the error indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*